**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEWIS HUGHES**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:10cv1300 |
| v. | ) | **Electronic Filing** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

**I.    INTRODUCTION**

Lewis Hughes ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("the Act").  This matter comes before the court on cross motions for summary judgment.  (ECF Nos. 8, 12).  The record has been developed at the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment will be granted in part and denied in part, and Defendant's Motion for Summary Judgment will be denied.

**II.    PROCEDURAL HISTORY**

Plaintiff filed for DIB and SSI with the Social Security Administration on June 13, 2008, claiming an inability to work due to disability beginning March 1, 2007.  (R. at 122 – 30).[1] Plaintiff initially was denied benefits on October 3, 2008. (R. at 76 – 85).  A hearing was scheduled for December 2, 2009, and Plaintiff appeared to testify represented by counsel.  (R. at 25).  A vocational expert also testified.  (R. at 25).  The Administrative Law Judge ("ALJ") issued a decision denying benefits on January 28, 2010.  (R. at 6 – 24).  Plaintiff filed a request for review with the Appeals Council, which request was denied on August 26, 2010, thereby making the decision of the ALJ the final decision of the Commissioner.  (R. at 1 – 5).

Plaintiff filed his Complaint in this court on October 7, 2010.  (ECF No. 3).  Defendant filed his Answer on December 22, 2010.  (ECF No. 5).  Cross motions for summary judgment followed.

## III.   STATEMENT OF THE CASE

### A.  General Background

Plaintiff was born on December 11, 1987, and was twenty-one years of age[2] at the time of his administrative hearing.  (R. at 32).  He is six feet, three inches tall, and weighed approximately two hundred and seventy pounds.  (R. at 32).  Plaintiff graduated high school, and wanted to become an electrical engineer; however, he did not complete his first year of college and had not returned.  (R. at 33, 54).  Plaintiff rented a room in the home of a family friend, and had subsisted on welfare and food stamps for approximately two years.  (R. at 33).  Plaintiff also received medical benefits through the state.  (R. at 33).  His past employment included positions

---

[1] Citations to ECF Nos. 6 through 6-8, the Record, *hereinafter*, "R. at __."

[2] Plaintiff is defined as a "Younger Person" at all times relevant to this determination.  20 C.F.R. §§ 404.1563, 416.963.

with McDonald's, Quizno's, Sunoco, Country Market, and Maid with Care.  (R. at 34 – 36, 55).

Plaintiff last worked briefly in April through July of 2009 on weekends as a cashier at Sunoco.

(R. at 57 – 58, 402).

B. Medical History

Plaintiff was admitted to Butler Memorial Hospital, in Butler, Pennsylvania on March 30,

2007, for an alleged benzodiazepine/Klonopin overdose.  (R. at 230 – 32).  He was diagnosed

with depression.  (R. at 230).  Hospital staff noted that Plaintiff stated he wanted to "end it all."

(R. at 239).  At the hospital, he was noted to be awake, oriented, and appropriate, and reportedly

had become unconscious shortly after being discovered by friends.  (R. at 233, 239 – 40, 249).  A

toxicology report did not detect the actual presence of benzodiazepine in his system.  (R. at 236,

258).  No one had witnessed him overdose.  (R. at 249).  He was transferred to UPMC Western

Psychiatric Institute and Clinic ("Western Psych") for inpatient treatment.  (R. at 230, 243).

Initially, staff at Western Psych noted Plaintiff's overdose to be questionable.  (R. at

258).  He supposedly swallowed a handful of Klonopin following an argument with his mother

and a friend.  (R. at 258 – 67).  While at Western Psych, Plaintiff claimed he had suffered

symptoms of depression for several years, worsening over time.  (R. at 258 – 67).  His global

assessment of functioning[3] ("GAF") score at admission was 25, and he was diagnosed with

---

[3] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and 100 being the highest. A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major

depression and impulsive control disorder.  (R. at 258 – 67).  Eventually, Plaintiff admitted that

he had been depressed over recently being "dumped" by his boyfriend, and did not take the

quantity of Klonopin he originally had claimed.  (R. at 259).  Plaintiff was started on Lexapro

and subsequently reported an improved, stable mood.  (R. at 260).  At the time of discharge from

Western Psych on May 7, he was noted to have normal speech, congruent affect, intact memory,

concentration, and attention, logical thought, good insight, and good judgment.  (R. at 260).

Plaintiff's mood was good, he was fully oriented, and he denied suicidal or homicidal ideation.

(R. at 260).  Plaintiff was referred for follow-up care.  (R. at 261).  The hospital reported its

treatment objective had been achieved.  (R. at 261).

Plaintiff appeared at UPMC St. Margaret Hospital in Pittsburgh, on June 26, 2007, for

follow-up care.  (R. at 270).  He reported that his mood was good, but that he had recently been

feeling a little down and irritable.  (R. at 270).  He was seeing a therapist.  (R. at 270).  He

complained of knee pain while walking stairs.  (R. at 270).  No significant injury was noted.  (R.

at 270).  Plaintiff had quit college and was working at the time.  (R. at 270).  He was found to

exhibit no compliance issues, but worsening depression negatively affected his social interaction

and increased conflicts at work.  (R. at 270).

Plaintiff also presented with joint pain, stiffness and anxiety; however, no bone pain,

decreased range of motion, joint instability, joint swelling, joint warmth, phobia, or suicidal

ideation was observed.  (R. at 270).  Plaintiff was obese, but walked normally and without

---

impairment in several areas, such as work or school, family relations, judgment, thinking or
mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or
"serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or
"inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or
occasionally fails to maintain minimal personal hygiene ... or gross impairment in
communication...." *Id.*

assistance, and showed no signs of distress.  (R. at 271).  His mood was anxious but appropriate,

his behavior was appropriate, his mental status and thought process were normal, and his speech

was clear and coherent.  (R. at 271 – 72).  Muscle tone and strength were normal.  (R. at 271).

Plaintiff was prescribed Darvocet, as needed, for pain, and was instructed to do exercises for leg

pain.  (R. at 272).  Plaintiff's Lexapro for his depression was increased.  (R. at 272).

Plaintiff was seen in the emergency room of Frick Hospital in Mt. Pleasant,

Pennsylvania, on April 21, 2008 for complaints of chest pain and anxiety.  (R. at 324 – 33).  He

appeared to be alert and oriented, but in mild distress.  (R. at 324 – 33).  Testing revealed no

physical abnormalities.  (R. at 324 – 33).  Plaintiff reported that his anxiety and chest pain began

the previous day, he had no history of suicidal ideation or thoughts of harming himself, no

history of threatening or violent behavior, no hallucinations or delusions, and no significant

somatic complaints.  (R. at 324 – 33).  Hospital staff noted a history of anxiety and bipolar

disorder, and that Plaintiff had recently stopped taking his medications due to a lack of

insurance.  (R. at 324 – 33).

Plaintiff was seen once at the Wesley Health Center in Connellsville, Pennsylvania, for

complaints of depression, bipolar disorder, and panic disorder on May 1, 2008.  (R. at 282).

Plaintiff complained of fatigue, anxiety and insomnia.  (R. at 282).  He was diagnosed with

depression, anxiety, and a history of panic attacks.  (R. at 282).  Symptoms related to these

diagnosed conditions were thought to be worsening.  (R. at 282).

On May 5, 2008, Plaintiff was assessed for intake at Chestnut Ridge Counseling Services

("Chestnut Ridge") in Connellsville, Pennsylvania.  (R. at 423 – 25).  He was noted to have been

previously diagnosed with depression, bipolar disorder and anxiety disorder.  (R. at 423 – 25).

Plaintiff described having difficulty focusing, lacking motivation, and attempting suicide in the

past.  (R. at 423 – 25).  He denied past violence or engaging in self-harm/mutilation.  (R. at 423 –

25).  No anxiety was observed during the intake assessment, and Plaintiff's thought processes

were noted to be relevant/intact, he was alert and oriented, and he denied hallucinations or

delusions.  (R. at 423 – 25).  He was given a GAF score of 45.  (R. at 423 – 25).

On May 9, 2008, Plaintiff underwent a psychiatric evaluation by Marjorie Tavoularis,

M.D., at Chestnut Ridge.  (R. at 335 – 37).  Plaintiff described a history of bipolar disorder to Dr.

Tavoularis with an onset date approximately one year earlier.  (R. at 335 – 37).  He described

spending five months in a constant manic state followed by a severe depressive episode during

which he was admitted to Western Psych for an attempted overdose.  (R. at 335 – 37).  Since that

time he had been prescribed Lexapro and Klonopin for treatment, but had recently switched to

Prozac because Lexapro had adverse side-effects.  (R. at 335 – 37).  He believed that the

medications were working.  (R. at 335 – 37).  He stopped taking his medications until

approximately a few weeks prior to his evaluation due to the lack of funds, but after resuming his

medications he had not experienced bad mood swings.  (R. at 335 – 37).  He did report some

depression and confusion.  (R. at 335 – 37).  Plaintiff also claimed to have been diagnosed with

chondromalacia[4] in his knee, and a functional heart murmur – although diagnostic testing did not

support it.  (R. at 335 – 37).  He also described using poor judgment when spending money, and

his compulsive spending often made him suicidal because of his indebtedness.  (R. at 335 – 37).

Upon examination, Dr. Tavoularis described Plaintiff as well-developed, tall, and

muscular appearing.  (R. at 335 – 37).  He was alert and cooperative, although slightly sad.  (R.

---

[4] Chondromalacia, or chondromalacia patella, is a term used to describe damaged cartilage under
the kneecap.  It may be treated by simply applying ice and resting.  However, physical therapy or
surgery may occasionally be required.  MayoClinic.com, http://www.mayoclinic.
com/health/chondromalacia-patella/DS00777.   (Last visited August 19, 2011).

at 335 – 37).  His intelligence seemed well above average.  (R. at 335 – 37).  He had significant

insight and no signs of psychosis.  (R. at 335 – 37).  Plaintiff was diagnosed with bipolar

disorder.  (R. at 335 – 37).  He was assessed a GAF score of 48, with an estimated high score of

60 and an estimated low score of 40 for the year.  (R. at 335 – 37).  Plaintiff was continued on

Klonopin and Prozac, and directed to engage in counseling.  (R. at 335 – 37).  He had

motivation to improve.  (R. at 335 – 37).

Records indicate Plaintiff continued to see Dr. Tavoularis, and other physicians and

counselors at Chestnut Ridge, through August of 2009.  (R. at 338 – 43, 397 – 447).  During this

period his medications were regularly updated.  (R. at 338 – 43, 397 – 447).  His GAF scores

ranged from 50 to 55, gradually improving over the course of treatment.  (R. at 338 – 43, 397 –

447).  His typical diagnoses included depression, bipolar disorder, and anxiety disorder.  (R. at

338 – 43, 397 – 447).  Plaintiff's speech was usually clear, he fully participated and was able to

maintain attention, he was alert and oriented, he was cooperative, he exhibited organized

thoughts, and he did not endorse suicidal ideation.  (R. at 338 – 43, 397 – 447).  However, his

mood, affect, concentration, and motivation fluctuated.  (R. at 338 – 43, 397 – 447).

Plaintiff again visited Frick Hospital on June 9, 2008 for right knee pain.  (R. at 284 –

89).  Plaintiff claimed that his knees caused him to fall.  (R. at 284 - 89).  At the time, Plaintiff

was alert and oriented, with clear speech, but was somewhat anxious.  (R. at 284 – 89).  Plaintiff

was given a knee immobilizer and crutches, and instructed to avoid weight bearing.  (R. at 284 –

89).  Plaintiff was diagnosed with sprain/strain of the right anterior knee, bipolar disorder,

anxiety disorder, and nervousness.  (R. at 284 – 89).  An x-ray of Plaintiff's knee was

unremarkable.  (R. at 294).

While at Chestnut Ridge on June 16, 2008, Plaintiff reported that he was tolerating his medications without side effects and his Klonopin was treating his anxiety effectively.  (R. at 338 – 43, 397 – 447).  His mood swings had decreased significantly, his sleep was better, and his appetite was good.  (R. at 338 – 43, 397 – 447).  He did mention occasional breakthrough anxiety, however.  (R. at 338 – 43, 397 – 447).

On October 1, 2008, Plaintiff was again admitted to Western Psych.  He was transferred from UPMC Presbyterian Hospital in Pittsburgh after a near fatal intentional overdose of his prescription medications.  (R. at 370, 468 – 530).  Plaintiff claimed that he was feeling depressed after a fight with his boyfriend and wanted to "make it all go away."  (R. at 370, 468 – 530).  Plaintiff was discovered by his boyfriend ingesting the medication.  (R. at 370, 468 – 530).  Plaintiff was treated for coma and respiratory failure.  (R. at 370, 468 – 530).  He was involuntarily admitted for inpatient treatment.  (R. at 370, 468 – 530).  Plaintiff's psychological history was noted.  (R. at 370, 468 – 530).  He was brought back to mental baseline, and was treated with prescription medications, individual therapy, group therapy, psychoeducation and behavioral techniques.  (R. at 370, 468 – 530).

Plaintiff was discharged from Western Psych on October 7, 2008.  (R. at 371 – 73, 468 – 530).  Plaintiff had been stabilized and his suicidal ideation was resolved.  (R. at 371 – 73, 468 – 530).  He denied suicidal ideation or behavioral impulsivity prior to discharge.  (R. at 371 – 73, 468 – 530).  Staff notes indicate he exhibited marked improvement.  (R. at 371 – 73, 468 – 530).  No psychomotor agitation or retardation was present, Plaintiff's speech was normal, his mood was good, his affect was congruent, his memory was intact, his attention and concentration were intact, his thought processes were normal, his cognitive functions were at baseline, his insight was fair, and his judgment was fair.  (R. at 371 – 73, 468 – 530).  Plaintiff denied hallucination.

(R. at 371 – 73, 468 – 530).  He was diagnosed with depression.  (R. at 371 – 73, 468 – 530).

Plaintiff's GAF score at admission was assessed at 20.  (R. at 371 – 73, 468 – 530).  His score at

discharge was 50.  (R. at 371 – 73, 468 – 530).  The hospital noted that the treatment objective

had been achieved.  (R. at 374, 468 – 530).

At a December of 2008 visit to Chestnut Ridge, Plaintiff described his medications as

helpful and denied side effects.  (R. at 338 – 43, 397 – 447).  He denied depression, anger issues,

and hallucinations.  (R. at 338 – 43, 397 – 447).  His concentration and sleep were improved, and

his appetite was good.  (R. at 338 – 43, 397 – 447).  Panic attacks did occasionally occur when

he was overwhelmed.  (R. at 338 – 43, 397 – 447).

Over the next few months Plaintiff continued to report progress with his psychological

symptoms during his appointments at Chestnut Ridge.  (R. at 338 – 43, 397 – 447).  His mood

was increasingly reported as stable, and his affect was appropriate.  (R. at 338 – 43, 397 – 447).

Around March of 2009, some increased depression and moodiness was noted.  (R. at 338 – 43,

397 – 447).  By April 4, 2009, his physician indicated that he was doing well overall.  (R. at 338

– 43, 397 – 447).  Plaintiff indicated that he was feeling significantly better, that his mood

swings had improved substantially, and his medications were working very well.  (R. at 338 –

43, 397 – 447).  He denied suicidal or homicidal ideation.  (R. at 338 – 43, 397 – 447).  His sleep

and appetite were also good.  (R. at 338 – 43, 397 – 447).  By May of 2009, Plaintiff indicated he

had been feeling well enough to return to work at a gas station on weekends.  (R. at 338 – 43,

397 – 447).  His attention span was good, his mood was even, he denied depression, and he

denied side effects from his medication.  (R. at 338 – 43, 397 – 447).  He did endorse continued

panic attacks.  (R. at 338 – 43, 397 – 447).  Notwithstanding the improvement observed in April

and May, in June of 2009 Plaintiff reported an increase in mood fluctuation and panic.  (R. at 338 – 43, 397 – 447).

Plaintiff appeared at the Highlands Hospital emergency room in Connellsville, Pennsylvania, on August 12, 2009.  (R. at 376 – 85).  He was admitted for depression with suicidal ideation.  (R. at 376 – 85).  He complained of nausea and admitted to discontinuing his prescribed medications.  (R. at 376 – 85).  Plaintiff was alert and oriented, and was in no apparent distress.  (R. at 376 – 85).  He had full strength in all extremities.  (R. at 376 – 85).  He was noted to have stable spinal stenosis.  (R. at 376 – 85).  Plaintiff was diagnosed with depression, bipolar disorder and panic disorder.  (R. at 376 – 85).

Plaintiff claimed that his prescription medications were not effective.  (R. at 376 – 85). He described feeling helpless and hopeless.  (R. at 376 – 85).  He was anxious, but cooperative. (R. at 376 – 85).   His affect was appropriate, he exhibited no thought disorders, his speech was normal, and no flight of ideas was observed.  (R. at 376 – 85).  Plaintiff's complaints of auditory hallucination were considered questionable.  (R. at 376 – 85).  His insight and judgment were fair, his memory was good, his intellect was at least average, and he had good abstract thinking. (R. at 376 – 85).  Plaintiff was assessed a GAF score of 40.  (R. at 376 – 85).

Plaintiff was discharged on August 17, 2009.  (R. at 376 – 85).  During treatment, Plaintiff claimed that his last suicide attempt left him in a coma for a week and he suffered memory loss as a result.  (R. at 376 – 85).  Plaintiff stated that he had been receiving treatment at Chestnut Ridge for the past two years.  (R. at 376 – 85).  He was noted to be dysphoric and emotional during his hospital stay, and overreacted to environmental stressors.  (R. at 376 – 85). At the time of discharge he was considered to be more stable and he denied suicidal ideation.  (R. at 376 – 85).  His discharge diagnosis was bipolar affective disorder.  (R. at 376 – 85).   His

GAF score was 50.  (R. at 376 – 85).  Plaintiff followed up at Chestnut Ridge on August 20, 2009.  (R. at 397).  He reported taking his medications, denied medication side effects, hallucinations, or anger issues, had a good attention span, and was sleeping and eating well.  (R. at 397).

On September 22, 2009, following a move back to the Pittsburgh area, Plaintiff underwent a medical evaluation with Jill Haltigan, M.D.  (R. at 448 – 56).  His diagnoses were spinal stenosis, depressive disorder, and manic depressive disorder.  (R. at 448 – 56).  Dr. Haltigan had not seen Plaintiff in several years.  (R. at 448 – 56).  She concluded that Plaintiff should obtain x-rays and MRI's of his back to determine the exact pathology.  (R. at 448 – 56).  She noted that his left outer thigh had been numb for approximately six months.  (R. at 448 – 56).  Plaintiff explained that he had pain in his lower and middle back, problems with balance when walking, and weakness and numbness in his legs; but he did not require assistance to walk and he had not fallen in the past year.  (R. at 448 – 56).  Dr. Haltigan decided not to place Plaintiff on narcotic pain medication until other options such as physical therapy and pain management were tried.  (R. at 448 – 56).  She did place Plaintiff on Soma for his discomfort.  (R. at 448 – 56).

Dr. Haltigan reviewed Plaintiff's history of psychological problems and found that he had improved significantly and was without suicidal ideation.  (R. at 448 – 56).  She strongly recommended that he continue with medication management and counseling.  (R. at 448 – 56).  She observed that Plaintiff's insight was poor with regard to how abnormal it is for an individual at his age to require so many medications.  (R. at 448 – 56).

C.  Functional Assessments

11

Plaintiff was evaluated by Lanny Detore, Ed.D., on September 9, 2008, on behalf of the Bureau of Disability Determination.  (R. at 344 – 51).  Plaintiff explained that he was applying for DIB and SSI due to pervasive bipolar disorder, depression and anxiety.  (R. at 344 – 51).  He claimed to suffer panic attacks once or twice a day, potentially twice a week, every week or so.  (R. at 344 – 51).  The feeling that others were watching him or making derisive comments about him often preceded his panic attacks.  (R. at 344 – 51).  He also endorsed racing thoughts and suboptimal sleep patterns.  (R. at 344 – 51).  Plaintiff reported attempted suicide and admission to Western Psych in May of 2007 due to an overdose on aspirin.  (R. at 344 – 51).  He was continuing with counseling at Chestnut Ridge.  (R. at 344 – 51).  He explained that following his hospital admission in May of 2007, he engaged in counseling for two months, and was provided prescription medication for approximately six or seven months.  (R. at 344 – 51).

Plaintiff claimed that for the past five or six months he regularly attended monthly medication checks, but he could not consistently attend therapy because he lacked transportation.  (R. at 344 – 51).  He described attempting to maintain employment, but difficulty with panic attacks and concentration prevented him from holding positions for any significant length of time.  (R. at 344 – 51).  Plaintiff explained he had difficulty managing compulsive spending urges and had accumulated substantial debts.  (R. at 344 – 51).  However, he experienced no difficulties performing most activities of daily living.  (R. at 344 – 51).  He spent most of his time watching movies or taking walks around town.  (R. at 344 – 51).

Dr. Detore observed that Plaintiff was casually and neatly dressed, well-groomed, soft-spoken, had subdued affect, and did not smile.  (R. at 344 – 51).  Plaintiff was alert and oriented, exhibited average intellect and memory, and had intact remote and recent memory, intact abstract thinking, fair insight, and intact judgment.  (R. at 344 – 51).  Plaintiff did not describe

12

nightmares or ongoing dreams, reported no history of paranoia, and exhibited no psychotic thought processes or delusions.  (R. at 344 – 51).

Plaintiff could manage his own finances.  (R. at 344 – 51).  His prognosis was fair to guarded due to the rapid phases of his bipolar disorder and the level of his depression.  (R. at 344 – 51).  Dr. Detore felt that plaintiff would experience an increase in symptoms if he attempted to work at the time of the evaluation.  (R. at 344 – 51).  Plaintiff would experience some difficulty functioning in a work setting, and would experience increased panic and anxiety in social situations.  (R. at 344 – 51).  He also would have marked difficulty making judgments on simple work-related decisions, and would have moderately marked limitation in interacting with the public, co-workers, and supervisors, in responding appropriately to pressures in a usual work setting, and in responding appropriately to changes in a routine work setting.  (R. at 344 – 51).

On October 1, 2008, John Rohar, Ph.D., completed a mental residual functional capacity ("RFC") assessment.  (R. at 352 – 55).  Plaintiff was diagnosed with affective and anxiety disorders.  (R. at 352 – 55).  Dr. Rohar concluded that Plaintiff was only moderately to not significantly limited in all categories of functioning.  (R. at 352 – 55).  Dr. Rohar based his determination upon a review of Plaintiff's record and the opinion of Dr. Detore.  (R. at 352 – 55).  Dr. Rohar found Dr. Detore's opinions to be inconsistent with the totality of the evidence on record, and accorded little weight to these findings.  (R. at 352 – 55).  Dr. Detore's findings purportedly were flawed due primarily to his almost exclusive reliance upon the subjective complaints of Plaintiff.  (R. at 352 – 55).  They were an overestimation of Plaintiff's true limitations, because Plaintiff's subjective complaints were considered to be inconsistent with the record.  (R. at 352 – 55).  Plaintiff was found by Dr. Rohar to be capable of engaging in substantial gainful activity.  (R. at 352 – 55).

Plaintiff was seen by Lindsey Groves, Psy.D., on November 11, 2009.  (R. at 457 – 67).
After an interview and a review of Plaintiff's medical records, Dr. Groves diagnosed Plaintiff
with Bipolar disorder, panic disorder with agoraphobia, cognitive disorder, and borderline
personality disorder.  (R. at 457 – 67).  She noted that Plaintiff felt that therapy had not helped in
the past, and while his medications had helped, he still remained symptomatic.  (R. at 457 – 67).
Dr. Groves' prognosis for Plaintiff was highly guarded given the chronic nature of his
psychological conditions.  (R. at 457 – 67).  She determined that he would require ongoing
counseling and medication management.  (R. at 457 – 67).

Dr. Groves further indicated that Plaintiff was one hundred percent disabled, met Social
Security listings for affective disorder, anxiety related disorders, and personality disorders, and
was incapable of engaging in substantial gainful activity.  (R. at 457 – 67).  She assessed a GAF
score of 50.  (R. at 457 – 67).  She noted that he was cooperative and compliant, made good eye
contact and had appropriate behavior, his thoughts were organized, and his insight was intact, but
his mood was dysphoric.  (R. at 457 – 67).  She found he had a history of poor memory, appetite
disturbance with weight change, sleep disturbance, personality change, mood disturbance,
emotional lability, hallucinations, recurrent panic attacks, anhedonia, paranoia, feelings of
guilt/worthlessness, difficulty concentrating, suicidal ideation/attempts, social withdrawal, blunt
affect, decreased energy, manic syndrome, obsessions/compulsions, irrational fears,
hostility/irritability, and pathological dependence/passivity.  (R. at 457 – 67).  She marked in her
findings that Plaintiff was moderately limited in activities of daily living, markedly limited in
maintaining social functioning and concentration, persistence, and pace, and suffered four or
more episodes of decompensation of extended duration.  (R. at 457 – 67).  Plaintiff's ability to
use judgment, deal with work stress, and behave in an emotionally stable manner were all

14

considered to be poor.  (R. at 457 – 67).  Plaintiff's other functional capabilities were rated as

fair to good.  (R. at 457 – 67).

   D.  <u>Administrative Hearing</u>

      At his hearing Plaintiff testified that he had lived with his mother in the Pittsburgh area

until August of 2007.  (R. at 43).  For approximately ten years, his mother's and his primary

source of income was social security disability benefits.  (R. at 54 – 55).  Plaintiff thereafter

moved in with his now ex-boyfriend in Everson, Pennsylvania.  (R. at 43).  Plaintiff's ex-

boyfriend suffered from bipolar disorder and received social security disability benefits.  (R. at

43, 55).  The on-and-off relationship was traumatic and abusive.  (R. at 44).  Approximately two

months prior to his administrative hearing, Plaintiff broke up with his ex-boyfriend and relocated

to the home of a family friend in Pittsburgh where he rented a room.  (R. at 43 – 45).

      Plaintiff claimed he quit all of his past jobs as a result of panic attacks and anxiety, mood

swings, and difficulty dealing with other people.  (R. at 34 – 35, 37).  Plaintiff intermittently

worked throughout 2007, and for a portion of 2009.  (R. at 35 – 36, 57 – 58).  He did not

otherwise seek work after December of 2007 following a severe automobile accident wherein he

sustained injuries to his back and neck, and was in a coma.  (R. at 38).  Plaintiff no longer drove

as a result of the emotional trauma caused by the crash.  (R. at 40).  He made a full recovery and

was not limited by the injuries he sustained.  (R. at 38).

      Plaintiff did not believe he was capable of working because any attempts to return to the

workforce ended prematurely due to his panic and anxiety.  (R. at 41, 59).  He also found that

pre-existing spinal stenosis and resultant back pain prevented him from sitting or standing for

prolonged periods, and made his left leg mostly numb.  (R. at 41).  Despite having earlier

testified that the conditions arising from his car accident had completely resolved, he claimed

that as a result of being in a coma following the accident he lost his reflexes and his legs

constantly gave out. (R. at 42). He reported losing his balance easily and falling often. (R. at

42). Plaintiff asserted he had seen multiple doctors for his physical condition, but could not

remember their names or the treatments received. (R. at 53 – 54). He claimed to have been

treated for his physical conditions mostly by his primary care physician. (R. at 53).

Plaintiff reported having received psychiatric care from a Dr. Mullick at Western Psych

in the months preceding his hearing. (R. at 39 – 40). He also was receiving counseling from a

therapist by the name of Gerald Price through Western Psych. (R. at 39 – 40). Dr. Mullick had

increased Plaintiff's dosage of his current prescription medications, and added another for

treatment of his psychological conditions. (R. at 41). Plaintiff did not complain of side effects

from his medications. (R. at 41).

Plaintiff admitted to being hospitalized from September 27 through October 7 of 2008

following an argument with his ex-boyfriend. (R. at 43 – 44). The ex-boyfriend was addicted to

narcotics and had become physically abusive with Plaintiff. (R. at 46). The ALJ characterized

much of Plaintiff's treatment history as short stints in therapy following traumatic episodes with

his ex-boyfriend. (R. at 47, 52). However, once Plaintiff had stabilized psychologically, he

would quit seeking therapy. (R. at 47, 52). Plaintiff claimed that this pattern was the result of

difficulty finding transportation to and from therapy, and because he had a difficult time opening

up to others. (R. at 48, 52). Plaintiff further explained that although he had a driver's license, he

did not have access to an automobile after his car was repossessed, there was no public

transportation available to him in Everson, and his mother was unable to drive him to

appointments because of the distance between Everson and Pittsburgh. (R. at 48 – 49). Plaintiff

did not follow through with an application for special transportation accommodation through the

state.  (R. at 50).    Plaintiff maintained that despite his difficulties with transportation and lack of consistent counseling, he never stopped taking prescription medication.  (R. at 59).

Generally, Plaintiff stated he did not feel emotionally stable enough to seek new relationships.  (R. at 52).  He described having severe mood swings at times, and claimed to have considered killing his mother in their home, stopping when he suddenly realized what he was doing.  (R. at 60).  He did not sleep well, getting approximately three hours of sleep per night, only four to five nights a week.  (R. at 38 – 39).  Plaintiff blamed his insomnia on racing thoughts and frequent panic attacks.  (R. at 39).  His only hobby or activity was listening to music.  (R. at 40).  He admitted to considerable indebtedness: $8,000.00 outstanding on his repossessed vehicle, and outstanding debt on five credit cards – with one card having a balance of $1,000.00.  (R. at 50 – 51).

Following Plaintiff's testimony, the ALJ asked the vocational expert to characterize Plaintiff's former jobs.  (R. at 62 – 63).  The vocational expert reported that Plaintiff's past employment included that of a light exertional, semi-skilled "automobile self-serve service station attendant," a light exertional, unskilled "housekeeping cleaner," a light exertional, unskilled "fast food worker," and a medium exertional, unskilled "stores laborer."  (R. at 63 – 64).  The ALJ asked whether a person of Plaintiff's age, educational background, and employment experience could perform Plaintiff's past relevant work, or any other jobs existing in significant numbers in the national economy, if he or she had no exertional or postural limitations and could ask simple questions, accept instruction, and perform and function in a production-oriented environment, but would be required to avoid exposure to workplace hazards such as dangerous moving machinery and unprotected heights due to problems with concentration, and would be limited to simple, one to three-step tasks of a routine and repetitive

nature, performed in a stable work environment requiring only occasional independent decision making, occasional interaction with the public, and occasional interaction with co-workers due to difficulty with concentration.  (R. at 64 – 65).

The vocational expert responded that such a person would be capable of returning to Plaintiff's past relevant work as a housekeeping cleaner and stores laborer.  (R. at 65).  Further, such a person would be eligible for employment as a "dining room attendant," with 339, 588 positions available in the national economy, as a "kitchen helper," with 381,127 positions available, and as a "hospital cleaner," with 341,370 positions available.  (R. at 66).  The ALJ followed by asking whether employment would be available to a hypothetical person with the limitations claimed by Plaintiff at the hearing.  (R. at 67).  The vocational expert replied that no jobs would be available to such a person.  (R. at 68).  In response to questioning by Plaintiff's attorney, the vocational expert also stated that a person with an inability to deal with minimal stress, an inability to miss/be tardy for work no more than twice a month on an ongoing basis, an inability to stay on task at least ninety percent of a given work day, or an inability to make simple work-related decisions, would be precluded from maintaining substantial gainful employment.  (R. at 68 – 70).

## IV.   STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[5] and 1383(c)(3).[6]  Section 405(g) permits a district court to review the transcripts and records upon which the determination of the Commissioner is based.

---

[5] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ...

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g);  *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.  *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389,  401 (1971)).

If the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.  A district court cannot conduct a de novo review of the Commissioner's decision nor re-weigh the evidence of record.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting de novo might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings.").  In other words, as long as the Commissioner's decision is supported by substantial evidence, it cannot be

---

> brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[6] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions.  He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative law judge must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986); *see also Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987).   A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A), 1382c(a)(3)(B).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S. Ct. 376, 157 L.Ed.2d 333 (2003) (footnotes omitted); *see also* 20 C.F.R. § 404.1520.  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given the plaintiff's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in the national economy.  *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision.  In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67

S. Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of
> administrative law.  That rule is to the effect that a reviewing court, in dealing
> with a determination or judgment which an administrative agency alone is
> authorized to make, must judge the propriety of such action solely by the grounds
> invoked by the agency.  If those grounds are inadequate or improper, the court is
> powerless to affirm the administrative action by substituting what it considers to
> be a more adequate or proper basis.  To do so would propel the court into the
> domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.  The United States Court of Appeals for the Third Circuit has

recognized the applicability of this rule in the Social Security disability context.  *Fargnoli v.

Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001).  Thus, the Court's review is limited to the four

corners of the ALJ's decision.

## V.  DISCUSSION

The ALJ found that Plaintiff suffered from the medically determinable severe

impairments of bipolar disorder, anxiety disorder, panic disorder with no severe agoraphobia and

obesity.  (R. at 11).  These impairments limited Plaintiff to jobs not involving exposure to

workplace hazards such as dangerous moving machinery and unprotected heights, and requiring

only simple, one to three-step tasks of a routine, repetitive nature, in a stable work environment,

provided there would be only occasional independent decision making, interaction with co-

workers, and interaction with the public.  (R. at 17 – 18).  Plaintiff would, however, be capable

of asking simple questions, accepting instructions, and performing and functioning in production

oriented jobs.  (R. at 17 – 18).  Consistent with the testimony of the vocational expert, Plaintiff

was determined to be capable of engaging in his past relevant work, as well as a significant

number of jobs in the national economy.  (R. at 20 – 21).

Plaintiff contends the ALJ erred in failing to find Plaintiff disabled at Step 3 and in formulating an incomplete hypothetical and RFC assessment.  (ECF No. 9 at 16 – 24).  He further argues that new evidence not considered by the Appeals Counsel, despite its significantly probative value, merits remand for consideration by the ALJ.  (*Id.*).  Defendant urges the court to conclude that the ALJ's decision was supported by substantial evidence, and to deny Plaintiff's request for remand, because the new evidence would have had no effect on the ALJ's ultimate conclusions.  (ECF No. 13 at 10 – 19).

Plaintiff specifically argues that medical records contained in Exhibit 17F[7] constituted new evidence justifying remand for consideration by the ALJ in accordance with *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  (ECF No. 9 at 16).  While a fair portion of the evidence in Exhibit 17F was generated shortly before the hearing and the ALJ's decision, the court need not determine whether the evidence meets all of the requirements to warrant a remand on this basis alone because the remaining aspects of the record demonstrate that a remand is warranted for independent reasons.  On remand Plaintiff can seek to develop the record with all probative evidence bearing on the period of disability under consideration.

Plaintiff's arguments regarding the sufficiency of the ALJ's hypothetical and RFC assessment, as well as the ALJ's determination that Plaintiff did not meet any of the listings at Step 3 and had the residual functional capacity to return to forms of his prior work at Step 4, will be discussed together, because the ALJ improperly discounted or disregarded evidence that impacted each significantly.  When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual bases underlying the ultimate determination on disability.  *Cotter v. Harris*, 642 F.2d 700,

---

[7] Exhibit 17F; R. at 532 – 64.

705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).  The ALJ must

discuss and provide sufficient explanation regarding his or her assessments of probative and

relevant evidence bearing on a claimant's disability status, and when rejecting or discounting

such evidence the ALJ must provide a sufficient level of analysis to allow the reviewing court to

determine whether any such rejection or discounting was proper.  *Johnson v. Comm'r of Soc.*

*Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112,

121 (3d Cir. 2000) ("In making a residual functional capacity determination, the ALJ must

consider all evidence before him.... Although the ALJ may weigh the credibility of the evidence,

he must give some indication of the evidence which he rejects and his reason(s) for discounting

such evidence.").  This is particularly true where there is conflicting probative evidence in the

record.  *Id.* (citing *Cotter*, 642 F.2d at 706 ("[T]here is a particularly acute need for some

explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting

probative evidence in the record.")).  In the present case, the ALJ failed to meet these standards.

In general, the ALJ determined that a longitudinal view of the record failed to support

Plaintiff's reports of disabling panic attacks and mood swings.  He further determined that

Plaintiff had exaggerated the nature and extent of his limitations and his reports of such

limitations were not supported by the reports from the treating sources.  He made a finding that

Plaintiff had "a secondary gain motivation" that was evident from his poor earnings record and

his primary support while growing up.[8]  Plaintiff had "little motivation" to seek employment,

apparently due to the lack of "a role model in his life who has worked."  (R. at 19).

---

[8] Plaintiff had no contact with his father.  Plaintiff's mother had a history of depression, panic disorder and agoraphobia which had rendered her disabled while Plaintiff was a young child. Plaintiff's maternal grandfather suffered a disabling stroke and was paralyzed when Plaintiff was 10 or 11.  (R. at 335  - 36).

With respect to the psychological opinions and limitations assessment of Dr. Groves, the only practicing clinical psychologist to have examined Plaintiff and/or all of the medical records detailing Plaintiff's ongoing history and treatment, the record included approximately ten pages of findings based upon a review of Plaintiff's medical record and an extensive in-person evaluation of Plaintiff.  (R. at 457 – 67).  In discussing Dr. Groves' opinions and assessments, the ALJ posited that prior evidence to support her conclusion that Plaintiff suffered a cognitive and/or personality disorder was not in the record and these manifestations of Plaintiff's emotional health were not evident from the earlier evaluations at Chestnut Ridge.  He also reiterated that the ultimate determination of disability under the Act is reserved for the ALJ.  (R. at 15, 19).

The ALJ rejected Dr. Groves' findings pursuant to the explanation that she had only evaluated Plaintiff for approximately one hour and had based a portion of her findings on medical records not ultimately submitted to the ALJ.  (R. at 19).  Dr. Groves' findings also apparently were substantially discounted due to her reliance upon Plaintiff's subjective complaints and supposedly because the longitudinal record did not support her conclusions.  (R. at 19).  And the longitudinal picture indicated that Plaintiff's depression and anxiety were related to situational and relationship problems and Plaintiff improved whenever he was compliant with his prescribed medication protocol.  (R. at 16).  Beyond this general conclusion, however, the ALJ discussed very few of the detailed findings of Dr. Groves, and failed to provide much in the way of record evidence to contradict said findings.  Such summary and ipse dixit reasoning fails to discharge the ALJ's duty to develop and examine the probative evidence of record, weight that evidence and provide adequate explanation for why certain evidence has been credited and other evidence has been rejected.

25

As an initial matter, the ALJ's logic that Dr. Groves' reliance on her examination of Plaintiff made her assessment of his mental and emotional health suspect falls short of satisfying the above-referenced standards.  It is well settled that in the context of psychiatric and psychological impairments, the ALJ may reject the opinions and assessments of treating and examining physicians only on the basis of contradictory medical evidence.  *Morales*, 225 F.3d at 317-18.  Of course, in doing so "an ALJ may not make speculative inferences from medical reports." *Plummer*, 186 F.3d at429 (citing *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981)). "In addition, an ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence." *Id.* (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985)); *accord Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984) (The ALJ should not substitute his lay opinion for the medical opinion of experts or engage in "pure speculation" unsupported by the record.).  Where conflicting evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)).  In other words,  an "ALJ cannot . . disregard [the import of competent medical evidence] based solely on his own amorphous impressions, gleaned from the record, and from his evaluations of the claimant's credibility." *Morales*, 225 F.3 at 318 (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)).  And "the principle that an ALJ should not substitute his lay opinion for medical opinion of experts is especially profound in a case involving a mental disability." *Id.* at 319.

Here, the treating and examining psychologists/psychiatrists were trained in psychology and psychiatry.  That training would have included the skills necessary to detect malingering or exaggeration.  The examining psychologists and psychiatrists all arrived at essentially the same

diagnoses and assessment of plaintiff's ability to function.  These mental health care experts

consistently recognized significant conditions and limitations over a two year period of time.

Plaintiff was evaluated by Dr. Tavoularis in May of 2008 and over a period of time

examination and counseling produced diagnoses that typically included depression, bipolar

disorder and anxiety disorder.  (R. at 338 – 43, 397 – 447).  His GAF scores as assessed by these

mental health experts likewise ranged from 40 to a high of 55, which was not indicative of an

individual who can cope with the rigors of substantial gainful activity on a systematic and

sustained basis.  (R. at 335 – 43, 397 – 447).  During this time Plaintiff was hospitalized at

Western Psych for a second time, diagnosed with depression and given a low GAF score of 20 at

admission and a high score of 50 at discharge, all of which is additional medical evidence that is

consistent with the records from Chestnut Ridge.  (R. 371 – 73, 468 – 530).

Furthermore, the record contains no affirmative evidence reflecting a longitudinal

improvement in plaintiff's mental or emotional health in the months preceding Dr. Goves'

assessments.  Plaintiff experienced a second admission to Western Psych on October 1, 2008.

And while he did enjoy a brief period of improvement in the late winter and spring of 2009, he

had a third admission for poor mental health on August 12, 2009, at Highlands Hospital, which

lasted for five days.  During this time Plaintiff continued to seek treatment at Chestnut Ridge,

which provided a well-developed record that supported Dr. Groves' review and assessment in

November of 2009.

Against this backdrop the ALJ's attempt to discount Dr. Groves' November 2009 opinions

and assessments based on the reasoning that Plaintiff's condition would not be disabling if he

merely avoided an ongoing relationship and/or further interaction with his ex-boyfriend cannot

stand.  Without any support for such a cause and effect analysis in the medical evidence of the

treating and examining mental health providers/consultants, such reasoning amounts to nothing more than a rank lay opinion that cannot supply substantial evidence and runs counter to the principles in *Morales* that an established mental disability cannot be dismissed based on the substitution of lay opinion and rank speculation.

The ALJ's attempt to attribute Plaintiff's claimed limitations to a secondary desire for monetary gain and the lack of an affirmative wage earner as a role model suffer from the same shortcomings.  There was not even a scintilla of evidence to support these attributions as being actual causes of Plaintiff's impairments or his claimed limitations.  Furthermore, the trained medical experts indicated Plaintiff was motivated to overcome his poor mental health and Plaintiff attempted to return to the workforce for two days a week in the Spring of 2009 when he enjoyed a brief respite of better health.  This affirmative evidence directly undermined the ALJ's speculative inferences.

Moreover, Dr. Groves' examination of Plaintiff and her review of his medical records led her to render the diagnoses of bipolar disorder, panic disorder with agoraphobia, cognitive disorder, and borderline personality disorder.  (R. at 457 – 67).  She noted a long list of symptoms and behaviors that were quite consistent with the impairments and limitations noted by Dr. Tavoularis, which included appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, paranoia, feelings of guilt/worthlessness, difficulty concentrating, suicidal ideation/attempts, social withdrawal, blunt affect, decreased energy, manic syndrome, obsessions/compulsions, irrational fears, hostility/irritability, and pathological dependence/passivity.  (R. at 457 – 67).  These behaviors and symptoms were consistent with and evidenced by Plaintiff's cyclical bouts of poor mental health noted in the treatment records generated at Chestnut Ridge as well as the

records generated from Plaintiff's repeated hospitalizations.  Thus, Dr. Groves' extensive findings and assessments were significantly supported by all other mental healthcare providers who actually examined Plaintiff and reviewed his history of ongoing mental health treatment on a longitudinal continuum.

The only consulting expert who examined Plaintiff at the Commissioner's request likewise rendered findings and assessments that were consistent and in line with those of Dr. Groves.  Psychologist Detore evaluated Plaintiff in September of 2008 and determined that he had a fair to guarded prognosis due to the rapid phases of his bipolar disorder and the degree of his depression.  (R. at 344 – 51).  Dr. Detore formed the opinion that Plaintiff would experience difficulty in a work setting and experience increased panic and anxiety in social situations, assessments that appear to be supported by a longitudinal review of the record.

Against this backdrop, the summary conclusions reached by John Rohar,  Ph.D., did not supply substantial evidence that directly undermined Dr. Groves' opinions, assessments and limitations.  Dr. Rohar conducted a record review on October 1, 2008.  As of that date Plaintiff's medical records appear to have consisted of Plaintiff's initial hospitalization at Western Psych in March of 2007, his follow-up care at St. Margaret Hospital, emergency room visits at Frick Hospital and Wesley Health Center and the initial assessment by Dr. Tavoularis at Chestnut Ridge.  They could not have included the significant body of medical evidence generated from Plaintiff's second hospitalization at Western Psych from October 1 through October 7, 2008,  his third hospitalization from August 12, through August 17, 2009, at Highlands Hospital, and his ongoing treatment at Chestnut Ridge from December of 2008 through August of 2009, all of which would have been available to Dr. Groves in November of 2009.

Furthermore, Dr. Rohar's assessments were limited to completing a check-the-box form and the rendering of summary conclusions with no explanation as to what had been considered, the manner and degree to which any particular piece of medical or other evidence was credited or discredited and the reasons for doing so, and a comparison or contrasting with the remaining body of evidence.  In other words, it constituted mere conclusion without any supporting explanation.   It is well-settled that such assessments have minimal probative force, *see Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986), particularly where they are in conflict with much of the remaining medical evidence.  *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) (single piece of evidence is not substantial where it is overwhelmed by other evidence); *accord Morales*, 225 F.3d at 320.

Of course, the ALJ's summary dismissal of a large body of probative and consistent medical evidence going to the heart of Plaintiff's claimed disability based on the same reasoning and without detailed comparisons, contrasts and evaluations of the determinations by those who have been trained to provide competent mental health care does not discharge the ALJ's duty to engage in a sufficient discussion of the entire record and provide adequate explanations for why a body of highly probative medical evidence has been rejected.   In other words, in this setting the ALJ's personal observations and assessments of the claimant and/or his credibility and clandestine motivation lack probative force and cannot supply a sufficient basis for rejecting the critical and enlightened assessments by the examining and treating mental health providers. *Morales*, 225 F.3 at 319 ("This Court has said before that an ALJ's personal observations of the claimant carry little weight in cases involving medically substantiated psychiatric disability."). Given the fairly uniform body of medical evidence by the treating and examining mental health care professionals, the ALJ was not at liberty to reject the substantial body of consistent opinions

30

and assessments as it existed at the time of the hearing without significant contrary objective

medical evidence that took into account all of the medical evidence as it existed.

The ALJ also was not at liberty to reject summarily Plaintiff's subjective complaints and

reports of limitations.  The Act recognizes that under certain circumstances the subjective

reporting of limitations may in itself may be disabling:

> [a]n individual's statement as to pain or other symptoms shall
> alone not be conclusive evidence of disability ...; there must be
> medical signs and findings, established by medically acceptable
> clinical or laboratory diagnostic techniques, which show the
> existence of a medical impairment that result from anatomical,
> physiological or psychological abnormalities which could
> reasonably be expected to produce the pain or other symptoms
> alleged and which, when considered with all evidence
> required to be furnished under this paragraph (including
> statements of the individual or his physician as to the
> intensity and persistence of such pain or other symptoms
> which may reasonably be accepted as consistent with
> the medical signs and findings), would lead to a
> conclusion that the individual is under disability.

42 U.S.C. § 423 (d)(5)(A); *Green v. Schweiker*, 749 F.2d 1066 (3d Cir. 1984).  The United States

Court of Appeals for the Third Circuit has set forth a four-prong standard to be used by district

courts when reviewing assessments of the Commissioner based on subjective reports of

significant limitations: (1) subjective complaints are to be seriously considered, even where not

fully confirmed by objective medical evidence; (2) subjective complaints may support a claim

for disability benefits and may be disabling; (3) when such complaints are supported by medical

evidence, they should be given great weight; and finally, (4) where the claimant's testimony

about the reported limitation is reasonably supported by medical evidence, the ALJ may not

discount the limitation without contrary medical evidence.  *Ferguson v. Schweiker*, 765 F.2d 31

(3d Cir. 1985).

In evaluating such limitations, an ALJ must accord subjective complaints the same treatment as objective medical reports, in that he must weigh all the evidence before him and explain his or her reasons for crediting and/or rejecting such evidence.  *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000).  In doing so serious consideration must be given to subjective complaints where a medical condition exists that could reasonably produce such complaints.  *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).  When medical evidence provides objective support for the subjective complaint, the ALJ can only reject such a complaint by providing contrary objective medical evidence.  *Mason*, 994 F.2d at 1067-68.  And "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations.  The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work."  *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)).  An ALJ also must give a claimant's subjective description of his or her inability to perform light or sedentary work serious consideration when this testimony is supported by competent evidence.  *Id.*

Here, the record was replete with diagnoses and confirmation of numerous mental health impairments that could be expected to produce the limitations reported by Plaintiff to the treating and examining mental health providers and the ALJ.  The natural of the impairments could well be expected to produce the limitations reflected in the treatment and consulting records and recounted by Plaintiff at the hearing.  Each of the trained mental health providers that interacted

with Plaintiff did not question the existence of the reported limitations and each treating source sought to render effective treatment to reduce those limitations.

The ALJ also glossed over the almost continual fluctuation in Plaintiff's psychological impairments, including the ongoing effort to find effective combinations of psychological medications and therapy.  The ALJ asserted that Plaintiff's anxiety was under control as long as Plaintiff was "medication compliant," when quite often the medical record and Plaintiff's own statements indicated otherwise.  The ALJ regularly attributed Plaintiff's hospitalizations to altercations with his boyfriend, but failed to indicate how this behavior was inconsistent with the expected effects of his diagnosed impairments and conditions – making what was in essence a medical conclusion when stating that his depression and anxiety were purely situational.  (R. at 16).  And even assuming this assessment had some validity with regard to Plaintiff's periodic episodes of  decompensation, the ALJ failed to explain the medical evidence used to reject the medically established proposition that Plaintiff's inability to handle conflict and maintain social relationships extended to the stresses of the workplace, at least as to Plaintiff's ongoing mental health in November of 2009.

The ALJ also failed to explain how the constant search for a successful combination of medication and therapy was consistent with an ability to meet the rigors of substantial gainful employment on an ongoing and sustained basis.  By the time Plaintiff was evaluated by Dr. Groves, his list of daily medications included Tegretol, Lamictal, Zofran, Xanax, Dolobid, Inderal LA, Loratdine, Prinzide, Klonopin, Prevacid, Medizine, Maxalt, Soma and Ventalin.  (R. at 461).  Even though Plaintiff did not generally complain of medication side effects, the record was replete with instances wherein medications needed to be adjusted and/or changed due to issues with effectiveness.  This was consistent throughout the period of time under review.

33

While Plaintiff's inability to access funds for proper medication also led to problems with medication effectiveness, this was far from the only source of difficulty in finding a course of treatment that would provide effective treatment on a long-term basis.  In this regard the ALJ failed to detail a complicated medical record in a thorough manner to account for this consistent and troubling aspect of the medical evidence.  Remand is therefore required.

With respect to the numerous GAF scores found in the record, the ALJ provided an even less thorough discussion, basing the decision to reject the validity of the scores outright on nothing other than broad generalizations that lacked the support of specific references to the record.  (R. at 19).  The ALJ reasoned that such scores generally are unreliable and not entitled to any meaningful consideration because from his perspective and experience mental health care providers could assign (and had assigned) wildly divergent scores within a relatively short period of time with no justified basis for doing so.  Of course, the ALJ failed to point to any such discrepancy in the instant record and except on a few occasions and for a brief period Plaintiff's GAF scores consistently were 50 or lower, measurements that the ALJ acknowledged are considered to be object findings of a significant impairment.  But having summarily rejected such scores as unreliable and unworthy of any credence, the ALJ's discussion only referenced the few higher GAF scores, presumably to bolster the final disability findings.  The ALJ failed to even mention the numerous lower scores, including many scores in the 20s and 40s.

GAF scores are probative evidence that should be addressed by an ALJ, even if such scores – standing alone – would not satisfy a claimant's burden of proving disability.  *Pounds v. Astrue*, 772 F. Supp. 2d 713, 725 - 26 (W.D. Pa. 2011).  An ALJ cannot merely discount such scores based on his own personal opinion that they generally are unreliable and untrustworthy.  Here, the array of low scores and the consistency over time were more than sufficient to warrant

34

meaningful consideration of the same in assessing whether Plaintiff had met his burden. Rejecting such scores as unreliable generally based on personal experience, focusing only upon a select handful of the highest GAF scores, and summarily rejecting numerous scores that suggest serious mental impairment, likewise was error justifying remand.  *Id.*

The ALJ likewise appears to have employed an incorrect standard in conducting his review of the record.  Judicial review of the Commissioner's decision addresses three issues: (1) whether the Commissioner applied the proper legal standards; (2) whether the findings of fact upon which the determination rests are supported by substantial evidence; and (3) whether the findings of fact resolved the crucial issues.  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) ("However, 'even if the Secretary's factual findings are supported by substantial evidence, this court may review whether the administrative determination was made upon correct legal standards.'") (quoting *Curtin v. Harris*, 508 F. Supp. 791, 793 (D.N.J.1981) (citations omitted)); *Strickland v. Harris*, 615 F.2d 1103, 1108 (5th Cir. 1980) ("The ALJ's conclusion of law will not be disturbed on judicial review (a) if it was reached through application of proper legal standards, (b) if the fact findings upon which it is based are supported by substantial evidence, and (c) if it was based on findings of fact which resolve the crucial issues.").   Consideration of the second and third issues presupposes that the correct legal principles have been applied to the facts.  In the disposition below the ALJ  references Plaintiff's failure (1) "to establish any continuous 12 month period since his alleged onset date during which his functional limitations associated with his impairments . . . have been of a level of severity to establish the presence of a presumptive disability" and (2) "to establish any continuous 12 month period since his alleged onset date during which the claimant's impairments have precluded his performance of the range

of work detailed above on a regular and continuous basis, eight hours a day for five days per week."  (R. at 16, 20).

Of course, as noted above to be eligible for benefits under the Act, a claimant must demonstrate that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has *or can be expected to last* for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A) (emphasis added); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986); *see also Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987).  The ALJ's disposition makes no attempt to address whether the medical evidence establishes that as of November of 2009 Plaintiff suffered from a combination of medically determinable mental impairments which were producing disabling limitations that could can be expected to last for a continuous period of twelve months from that or any prior point in time.  The inability to ascertain with some level of confidence that the ALJ measured Plaintiff's claims in conjunction with this component of the applicable standard of review supplies an additional ground warranting remand.

Finally, the ALJ drew negative inferences from the fact that Plaintiff had received recent treatment from Psychiatrist Mullick, Dr. Groves reviewed records from this treatment and the records had not been submitted to the ALJ for review and evaluation.  The ALJ was made aware of this ongoing treatment both at the hearing and through the submission of Dr. Groves' report and findings.  Notwithstanding the propinquity of this treatment, the ALJ did not ask Plaintiff to submit any records from this treatment provider, nor did he take any steps to obtain the records.  Instead, within two months of the hearing he merely drew the inference that they did not support Plaintiff's application and/or Dr. Groves' opinions and assessments (and by implication were

36

inconsistent with the treatment records from Chestnut Ridge in that they suggested the presence

of additional and/or more severe and debilitating limitations), even though the records were

generated by the most recent treating source and Dr. Groves' submission indicated they were the

most recent assessments of Plaintiff's impairments, directly addressed Plaintiff's current

symptoms and limitations and established disabling limitations.

      The ALJ fell short in his duty to develop the record fully when he failed to ascertain

whether there were records generated from the treatment and then drew negative inferences

because whatever was reviewed by Dr. Groves was not submitted for his review.  It is well

settled that an ALJ has a duty to develop the record adequately, even where the claimant is

represented by counsel.  *See Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir.2005); *Boone v.*

*Barnhart*, 353 F.3d 203, 208 n. 11 (3d Cir.2004) (collecting cases).  This is particularly true

where the record provides affirmative evidence indicating that additional development may be

needed to determine impairment severity in conjunction with mental impairments and any

resulting limitations.  *Baker v. Barnhart*, 2005 WL 2847689, * 11 (W.D. Pa. Oct. 28, 2005)

(citing 20 C.F.R. § 416.920(a)).  Here, the ALJ did not request that any records from the recent

treatment with Dr. Mullick be submitted or even offer to keep the record open for a period of

time so Plaintiff could obtain and submit those records.  The ALJ's review of Dr. Groves'

residual functional capacity assessment clearly indicated that Dr. Mullick had recently assessed

the severity of Plaintiff's impairments and rendered findings identifying additional impairments

in the form of a cognitive impairment and borderline personality disorder.  And while the ALJ

dismissed any basis in the record for a cognitive impairment, Plaintiff had reported symptoms

that were consistent with such a diagnosis after his October 1, 2008 "near fatal" overdose leading

to a coma and respiratory failure.  As previously noted, such information necessarily was not

available to Dr. Rohar or Dr. Detore and was not taken into account by any other medical source. It was contrary to the beneficent purposes of the Act to seize on the opportunity to draw negative inferences about these additional bases for the symptoms and limitations claimed by Plaintiff and highlighted by Dr. Groves without any effort to obtain competent medical evidence about them. As there are additional bases warranting remand, the ALJ should further develop the record, consistent with his duties, by exploring all available medical evidence (and any additional medical evidence deemed appropriate) on how these additional mental impairments contribute to Plaintiff's limitations or otherwise impact his ability to engage in substantial gainful activity.

## VI.   CONCLUSION

In light of the ALJ's failure to address properly all of the relevant evidence of record and indicate clearly that the proper legal principles were employed, the court cannot conclude that the decision at Step 3 was supported by substantial evidence, or that the hypothetical or RFC assessment were truly reflective of Plaintiff's credibly established limitations.  Accordingly, Plaintiff's Motion for Summary Judgment will be granted to the extent it seeks a remand; Defendant's Motion for Summary Judgment will be denied; the decision of the ALJ will be vacated; and the case remanded for further proceedings consistent with this opinion.  "On remand, the ALJ shall fully develop the record [for the entire period of disability under consideration] and explain [his or her] findings . . . to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization."  *Thomas v. Commissioner of the Social Security Administration*, 625 F.3d 798, 800 – 01 (3d Cir. 2010);

*accord Ambrosini v. Astrue*, 727 F. Supp.2d 414, 432 (W.D. Pa. 2010).  Appropriate orders will follow.

<u>Date: February 2, 2012</u>

<u>s/ David Stewart Cercone</u>
David Stewart Cercone
United States District Judge

cc.     E. David Harr, Esquire
        Albert Schollaert, AUSA

        (*Via CM/ECF Electronic Mail*)